# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00255-CR

**Sterling Lyn Thompson, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF BLANCO COUNTY, 424TH JUDICIAL DISTRICT
NO. CR01020, HONORABLE CHARLES F. CAMPBELL JR., JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Sterling Lyn Thompson of two counts of the felony offense of driving while intoxicated with a child passenger. *See* Tex. Penal Code Ann. § 49.045 (West 2011). Punishment was assessed at two years in state jail and a fine of $7,500, but the district court suspended imposition of the sentence and placed Thompson on community supervision for five years. In a single issue on appeal, Thompson asserts that counsel was ineffective for failing to challenge the admissibility of blood evidence tending to show that he was intoxicated. We will affirm the judgments of conviction.

## BACKGROUND

The jury heard evidence that on the evening of January 5, 2009, Thompson was driving his Ford pickup truck on Highway 281 in Blanco with his three-year-old son and eight-year-old daughter as passengers. Another motorist, Cynthia Horvath, was driving behind Thompson's vehicle when she noticed the vehicle "swerving in and out of its lane" "numerous" times. Horvath

testified that she reduced her speed to "get as much distance" as possible between herself and the other vehicle. Shortly thereafter, Horvath observed the truck collide with another vehicle. She described the collision as follows:

> [T]he vehicle was following an 18-wheeler and proceeded to pass this vehicle, the 18-wheeler, but he came over into the left lane. And at that time, there was another truck, an 18-wheeler, heading south and [Thompson's vehicle] hit the 18-wheeler. And then I saw [Thompson's vehicle] hit into the guardrail.

Horvath immediately stopped her vehicle, ran over to Thompson's vehicle (whose engine was still running), and proceeded to knock on the window to ensure that no one inside the vehicle was injured. Horvath testified that "a little girl rolled the window down," and she noticed that the girl was scared and crying. After calming the girl, Horvath began to talk to the driver of the vehicle, later identified as Thompson, and asked him to turn off the engine. Thompson refused, telling Horvath, "I need to get my truck out of the middle of the road." Horvath repeatedly told Thompson that he was not in the middle of the road but off to the side of the road, and she eventually convinced him to turn off the engine. Horvath testified that Thompson "looked real glassy eyed" when she was speaking to him. Horvath asked Thompson if he was a diabetic or if he had been drinking, and Thompson answered no to both questions. Thompson then asked Horvath to call his wife, which Horvath found odd because she did not know Thompson or his wife.

Another motorist who had witnessed the accident was James Butcher. Butcher testified that prior to the collision, he had observed Thompson's vehicle driving erratically, "coming from the northbound shoulder [of the road] . . . all the way over to the southbound lanes and then back in." According to Butcher, this was not an isolated occurrence. He testified that he had observed this behavior during "the majority" of the time he had been behind the vehicle. Butcher

2

explained, "[H]e wouldn't just drift over in the lane a little bit, he was drifting completely over to the other side of the road." In response to what he was observing, Butcher decided to call 911 and reported what he believed to be a drunk driver. Shortly thereafter, he saw the vehicle "swerve[] in front of an 18-wheeler and swerve[] back out, and then [go] back in towards him, and [catch] the rear end of the trailer."

George Alegria, the driver of the vehicle into which Thompson had collided, also testified. Alegria recounted how Thompson's pickup truck had attempted to pass an 18-wheeler that was in front of the pickup truck and that, as the pickup truck came out from behind the 18-wheeler, the pickup truck collided with the trailer of Alegria's truck, despite Alegria's efforts to swerve out of the way into the right shoulder of the road. Alegria explained, "[H]e didn't try to go back [into his lane]. He just came out and was going towards me" and was completely within Alegria's lane of traffic. Alegria testified that he did not believe that it was legal to pass at that point on the highway, because the road had been marked by a "double, solid, yellow line."

The emergency medical technicians (EMTs) who had responded to the accident were Ty Grenwelge and Betty Ruth Weirich. Grenwelge testified that when he spoke with Thompson, Thompson told him "that he was fine and climbed out of the passenger side [of the truck] by himself." According to Grenwelge, Thompson thought "that he could drive the vehicle home," and Grenwelge had to inform him that he could not because the vehicle "had been wrecked" and was not driveable. When asked what he had noticed about Thompson's demeanor, Grenwelge testified, "He acted really sleepy. Little slurred." Grenwelge added, however, that Thompson did answer questions appropriately. Grenwelge also testified that Thompson did not exhibit any signs or

3

symptoms that were consistent with a concussion, although he did have a minor head injury that appeared to be related to his head being scratched or cut by glass from a broken window.[1]

Grenwelge further testified that Thompson had told him that he was taking prescription pain medication, specifically methadone, and that he had taken the pain medication earlier that day. Grenwelge had observed signs that Thompson "was on" the medication, including acting "real sleepy," having "slurred speech," and exhibiting a "little stagger" as he walked from his truck to the ambulance. Grenwelge testified that he believed Thompson was impaired. He explained the basis for his belief as follows: "[T]he whole entire time that we were with him, which was possibly two hours, [he] kept dozing off trying to fall asleep. He could answer questions but was slow to respond. Couldn't wake. I mean, you could wake him up and stuff, but I mean, he would doze back off." Grenwelge added that these symptoms were different from symptoms indicating that a person had suffered a concussion. Weirich, the other EMT, similarly testified that she had observed Thompson "dozing off" and falling asleep during her interaction with him, that she did not believe he had suffered a concussion, that Thompson had admitted to her that he had taken pain medication, and that Thompson "was trying to get [his] bearings [as to] where he was at" and "didn't know where he was."

Texas Department of Public Safety Trooper Erich Neumann investigated the accident. When Neumann arrived at the scene, he observed that the portion of the highway where the collision had occurred was, in fact, "not a passing zone." Neumann also observed a prescription medicine

---

[1] The day after the accident, Thompson went to an urgent care center and was diagnosed with a head injury. Thompson's medical records from his visit were admitted into evidence, and the records indicate that a head injury is "often associated with" a "mild brain concussion." However, the records do not indicate that Thompson was diagnosed with a concussion.

4

bottle in Thompson's truck. Neumann testified that the label on the bottle indicated that the drug was cyclobenzaprine and that it was prescribed to Thompson. Neumann proceeded to interview Thompson, who told Neumann that he had been driving from San Antonio to his residence in Spring Branch. Neumann advised Thompson "that he was, in fact, significantly beyond Spring Branch and that he had overshot his destination, his home, by approximately 20 miles, a significant distance." Thompson denied to Neumann that he had been drinking, but admitted to having taken methadone, which Thompson characterized as a "light narcotic," at approximately 4:00 p.m. that afternoon, which was approximately three hours before the collision had occurred. Thompson also admitted to Neumann that he takes other pain medication in addition to the methadone, and he told Neumann that he sometimes "mixes" his medications in the prescription bottle.

Neumann proceeded to administer the horizontal gaze nystagmus (HGN) test on Thompson, which, according to Neumann, is used primarily to detect the presence of alcohol in the nervous system. Neumann observed no "clues" of alcohol intoxication during the administration of this test. However, while Neumann was conducting the test, he had to "wake [Thompson] up several times as he would start to fall asleep and drift off and close his eyes." Neumann began to suspect that Thompson was impaired. Neumann explained that he was suspicious for several reasons, including Thompson's "extreme lethargy, his slurred and mumbled speech, [and] the fact that he had to stop and think about answers and kind of search for answers rather than answering quickly." Other factors that Neumann considered in suspecting that Thompson was intoxicated included his interviews with eyewitnesses to the collision and the EMTs who told him that they suspected that Thompson was impaired; the fact that Thompson "had attempted to drive away completely unaware" that his vehicle was not driveable; Neumann's observation that when

5

Thompson had attempted to walk away from the ambulance, his balance was "extremely impaired" to the point where he was "stumbling" and "needing support"; and Neumann's interview with Thompson in which Thompson had admitted to taking methadone prior to the accident. Neumann concluded, "[I]t was those factors all together that were leading me at that point to start to suspect that we weren't looking at just merely a tired driver who had fallen asleep but that there was a reason for that tiredness and that could be medication related." Neumann subsequently arrested Thompson for driving while intoxicated.

After Thompson was arrested, Neumann administered additional field sobriety tests, including the walk-and-turn test and the one-leg-stand test. On these tests, Neuman testified, Thompson displayed several signs of intoxication, including that he "stopped while walking," "missed heel to toe on almost all the steps," "stepped off the line multiple times to catch his balance," "turned in the wrong direction," "swayed throughout the test," "hopped significantly during the test in an attempt to maintain his balance," and "switched from using one foot to the other in the midst of the test." Neumann also administered nonstandardized sobriety tests that "can help narrow down" whether a suspect's behavior is the result of "intoxication or other factors." On these tests, Neumann testified, he observed "several indicators" of intoxication, including that Thompson slurred several letters of the alphabet, did not follow instructions with regard to counting down numbers in a sequence, and missed touching his fingertips when instructed to do so and instead touched his knuckles. A video recording of Thompson performing some of the field sobriety tests was admitted into evidence and played for the jury.

Following his arrest, in addition to agreeing to perform the additional field sobriety tests, Thompson also consented to have his blood drawn. Neumann transported Thompson to the

6

Hill Country Memorial Hospital in Fredericksburg for that purpose. During the transport, Neumann testified, Thompson fell asleep and remained asleep for most of the ride. After they arrived at the hospital, Thompson's blood was drawn. Subsequent analysis of the blood revealed that it contained a "medium level" of Xanax, specifically .045 milligrams per liter, a non-quantified but "low-to-medium" amount of methadone, and a "very low level" of morphine, the specific quantity of which could not be determined. According to Eduardo Padilla, the lab analyst who testified at trial, these drugs act as central nervous system depressants that have effects similar to alcohol, such as "drowsiness, dizziness, slurred speech, blurred vision, and a general lack of motor coordination."

After having his blood drawn, Thompson was transported to Blanco County Jail for booking. Once there, Thompson provided a statement to Neumann. In the statement, Thompson indicated that he believed the date was December 28, even though the actual date was January 5, and he told Neumann that he did not know the city in which he was located. Also in his statement, Thompson acknowledged that he had been prescribed methadone, Oxycontin IR, and the Flexeril or cyclobenzaprine that had been found in his truck, but he could not recall when he had last taken the drugs.

Christina Thompson testified in her husband's defense. Christina testified that her husband has degenerative, herniated discs in his neck and that he is often in severe pain because "his nerves get pinched quite often." Christina explained that to treat the pain, doctors have prescribed "a whole slew of different medicines throughout the years," including methadone, hydrocodone, and amitriptyline. However, Christina denied that her husband had ever taken or been prescribed Xanax. On cross-examination, Christina admitted that when her husband would take methadone, it made him tired and "depressed." Christina also admitted that her husband had "looked intoxicated"

7

when she saw him after the accident. She explained, "[H]e was very drowsy. He just looked like, you know, it was hard for him to stay awake. His speech was slightly, you know, slurred. . . . If you didn't know him and he was just a stranger, you could assume that he was drunk." Christina further admitted that when she had spoken with Neumann on the night of the accident, she had told him that Thompson's behavior could be explained by methadone use and that Thompson looked to her like he was "stoned or drunk." She also admitted in her testimony that because she was not with her husband most of the day, she could not know what drugs he had or had not taken prior to the accident.

Thompson also testified in his defense. Thompson acknowledged that he has been taking different pain medications for approximately five years to treat the pain in his neck. He denied taking Xanax but admitted to having taken methadone in the past. However, he claimed that at the time of the accident, he was no longer taking methadone. According to Thompson, on the day of the accident, he was tired as a result of having stayed up all night taking care of his children who were sick with the flu, and he had flu symptoms himself. Thompson claimed that because of his illness and fatigue, he had "fallen asleep at the wheel," and that is what had caused the accident.

The jury found Thompson guilty as charged, and the district court sentenced him to community supervision as noted above. This appeal followed.

**STANDARD OF REVIEW**

To establish that he received ineffective assistance of counsel, Thompson must prove by a preponderance of the evidence that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*,

8

466 U.S. 668, 687-88 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). Thus, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

For a claim of ineffective assistance of counsel to succeed, the record must demonstrate both deficient performance by counsel and prejudice suffered by the defendant. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). An ineffective-assistance claim must be "firmly founded in the record" and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Id*. (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). "Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped." *Id*. This statement is true with regard to the "deficient performance" prong of the inquiry, when counsel's reasons for failing to do something do not appear in the record. *Id*. Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Id*. (quoting *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003)). If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Id*. (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). In other words, in the absence of a record explaining the reasons for counsel's decisions, we will not find counsel's performance deficient if any reasonably sound strategic motivation can be imagined. *See Garcia*, 57 S.W.3d at 440.

Further, to prove prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693.

Rather, a defendant must show that there is a reasonable probability, meaning a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different but for the unprofessional errors of counsel. *Id.* at 687.

## ANALYSIS

Thompson asserts that trial counsel was ineffective for failing to challenge the admissibility of the evidence tending to show that Thompson's blood contained narcotics at the time of the accident. Prior to trial, defense counsel had obtained a discovery order allowing him to conduct an independent analysis of the blood evidence. However, it appears that Thompson was unable to independently analyze the evidence because the State, when conducting its own analysis of the blood, had used up the sample. In a "motion to suppress blood test" that counsel filed prior to trial, Thompson alleged the following:

> [T]he Defendant's blood specimen was not preserved by the Texas Department of Public Safety. Defendant obtained a court order for independent testing of Defendant's blood sample. Defendant was advised by the Department that there remains no sample of Defendant's blood to independently test as the sample was utilized in the Department's testing procedures. The Department acted in bad faith in destroying the entire blood sample or alternatively failing to secure an adequate amount of Defendant's blood for independent testing.

However, for reasons that are not apparent from the record, defense counsel never urged nor obtained a ruling on his motion to suppress. It is this alleged deficiency that forms the basis for Thompson's ineffective-assistance claim. In Thompson's view, the blood evidence was "undeniably critical to the State's case," and counsel should have objected in some manner to its admissibility on the ground that he was not able to independently analyze the sample.

10

Because Thompson complains of the admission of evidence, to prevail on his claim of ineffectiveness he must show by a preponderance of the evidence that counsel's failure to obtain a ruling on the motion to suppress or otherwise object to the admissibility of the evidence fell below an objective standard of reasonableness and, if so, that there is a reasonable probability that, but for the evidence being admitted, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. In other words, Thompson must demonstrate that the evidence was inadmissible, that the motion to suppress would have been granted or the objection to the evidence sustained, and that the remaining evidence would have been insufficient to support the conviction. *See Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004); *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002); *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998); *Roberson v. State*, 852 S.W.2d 508, 511 (Tex. Crim. App. 1993); *Hollis v. State*, 219 S.W.3d 446, 456 (Tex. App.—Austin 2007, no pet.).

In this case, the basis for Thompson's motion to suppress was his claim that by using up the entirety of the blood sample for its own testing, the State effectively destroyed the evidence prior to Thompson having an opportunity to subject it to independent testing. This situation is governed by the line of cases following *Arizona v. Youngblood*, 488 U.S. 51 (1988). In *Youngblood*, the United States Supreme Court drew a distinction between "material, exculpatory evidence" and "potentially useful evidence." *Id.* at 58. A due-process violation occurs whenever the State fails to disclose material, exculpatory evidence, regardless of whether the State acted in bad faith. *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) (citing *United States v. Agurs*, 427 U.S. 97 (1976); *Brady v. Maryland*, 373 U.S. 83 (1963)). On the other hand, when the State destroys or fails to preserve potentially useful evidence, a due-process violation occurs only if the State acted in bad faith in

11

destroying the evidence. *Fisher*, 540 U.S. at 547-48; *Youngblood*, 488 U.S. at 57-58. Potentially useful evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57-58; *State v. Vasquez*, 230 S.W.3d 744, 747 (Tex. App.—Houston [14th Dist.] 2007, no pet.). The blood sample in this case is properly characterized as potentially useful evidence, as the most that can be said of it is that further testing of the sample might have exonerated the defendant. *See Vasquez*, 230 S.W.3d at 747-48. Therefore, the district court should have granted the motion to suppress only if the evidence was destroyed by the State in bad faith. *See id*. at 748.

"'Precisely what constitutes 'bad faith' is not clear.'" *Ex parte Napper*, 322 S.W.3d 202, 231 (Tex. Crim. App. 2010) (quoting George E. Dix & Robert O. Dawson, 42 Texas Practice: Criminal Practice and Procedure § 22.63 (2d. ed. 2001)). However, it is "more than simply being aware that one's action or inaction could result in the loss of something that is recognized to be evidence." *Id*. at 238. "[B]ad faith entails some sort of improper motive, such as personal animus against the defendant or a desire to prevent the defendant from obtaining evidence that might be useful." *Id*. When State action "can at worst be described as negligent," the failure to preserve evidence does not rise to the level of a due process violation. *Youngblood*, 488 U.S. at 58.

Here, the record would support findings by the district court that the State's failure to preserve the blood evidence was the result of nothing more than negligence. Trooper Neumann testified that DPS instructions require that at least 10 milliliters of blood be drawn for testing purposes. However, according to Neumann, there were problems with the vials that he and the hospital technician had on hand to store the blood and that, as a result, they ended up using a vial that was smaller than the standard size. Neumann was unclear in his testimony as to how much

12

blood was actually drawn. When asked if the amount drawn was less than 10 milliliters, Neumann testified, "No, sir. It was less than the size of the vial that I had. But it was the sufficient volume for testing." He later added, "[The blood] was drawn according to instructions. I can't tell you exactly how much there was." When the lab analyst, Padilla, was later questioned as to why all of the blood was "used up," Padilla testified, "We received a relatively small amount of the blood sample, 2.5 milliliters. We usually get about 8 to 10 milliliters, so we used it all for our testing." Padilla also testified that the blood had been received in a "smaller vial" that stored only 4 milliliters of blood and that the 2.5 milliliters that the vial contained was "about the proper amount" for the size of that vial. Finally, Padilla testified that the vial did not appear to have been tampered with and that the lab had "received it sealed." On this record, we cannot conclude that the district court would have suppressed the evidence. Accordingly, we cannot conclude that counsel was deficient in failing to obtain a ruling on his motion to suppress or otherwise object to the admissibility of the evidence.[2] *See Jackson*, 973 S.W.2d at 957.

We also cannot conclude on this record that there is a reasonable probability that, even if counsel had obtained a favorable ruling from the district court suppressing the blood evidence, the result of the proceeding would have been different. Contrary to Thompson's assertion, this does not appear to be a case in which the blood evidence was critical to the State's case. In a DWI prosecution, there are two ways in which the State can prove that a person was intoxicated:

---

[2] We further observe that part of counsel's strategy on cross-examination and in closing argument appears to have been to cast doubt on the reliability of the blood evidence and portray the State actors involved in obtaining the evidence as negligent. Thus, counsel may have made a strategic decision to use the problems with the blood evidence to his advantage rather than seek to exclude it altogether. And, because counsel has not had an opportunity to explain his actions, we are not to find counsel's performance deficient if any reasonably sound strategic motivation can be imagined. *See Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

(1) by having a blood alcohol concentration of .08 or more; or (2) by not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body. *See* Tex. Penal Code Ann. § 49.01(2) (West 2011). Here, the State alleged the second manner of intoxication, and it introduced ample evidence independent of the blood analysis to prove that Thompson did not have the normal use of his mental or physical faculties by reason of the introduction of a drug into his body. This evidence included: (1) two eyewitnesses who had observed Thompson "swerving in and out of his lane" and "drifting completely over to the other side of the road" on "numerous" occasions; (2) a third eyewitness whose vehicle had collided with Thompson's vehicle and who had observed Thompson attempt to pass an 18-wheeler on a section of a highway in which passing was prohibited; (3) the circumstances of the collision itself, which included Thompson attempting to pass an 18-wheeler despite the presence of another 18-wheeler coming toward him from the opposite direction; (4) two EMTs who had treated Thompson and had observed signs of impairment, including slurred speech, extreme drowsiness, and an inability to recall where he was; (5) the fact that Thompson had missed the highway exit to his residence and was off course by approximately 20 miles when the collision occurred; (6) the bottle of prescription drugs that was found in plain view in Thompson's truck and that had his name on it; (7) Thompson's admission to Neumann that he had taken methadone approximately three hours prior to the collision; (8) Thompson's admission to Neumann that he had been prescribed other pain medications in addition to methadone; (9) Thompson's admission to Neumann that he sometimes "mixes" his medications in the prescription bottle that was found in his truck; (10) Thompson's poor performance on numerous field sobriety tests; (11) Thompson falling asleep on the way to the

14

hospital and his inability to know what date it was or the city in which he was located after he had been taken to the jail; (12) the admissions by Thompson's wife to Neumann that Thompson looked "stoned" or "drunk" and that her husband's behavior could be explained by methadone use. In summary, this was not a close case on the issue of intoxication. Having reviewed the entire record, we cannot conclude that there is a reasonable probability that the result of the proceeding would have been different if only the blood evidence had been suppressed. We overrule Thompson's sole issue.

## CONCLUSION

We affirm the judgments of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:  August 8, 2012

Do Not Publish

15